937 F.2d 684
 137 L.R.R.M. (BNA) 3028, 290 U.S.App.D.C. 366,
119 Lab.Cas. P 10,819
 SOFT DRINK WORKERS UNION LOCAL 812, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 90-1461.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 15, 1991.
Decided July 9, 1991.
 
 Petition for Review of an Order of the National Labor relations board.
 Sidney Fox, with whom Gerald Richman, was on the brief, New York City, for petitioner.
 Joseph J. Jablonski, Jr., Atty., N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Paul J. Spielberg, Deputy Asst. Gen. Counsel, were on the brief, Washington, D.C., for respondent.
 Before WALD, RUTH BADER GINSBURG, and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 Soft Drink Workers Union Local 812 petitions for review of the National Labor Relations Board's ruling that it violated Sec. 8(b)(7)(B) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b)(7)(B), which prohibits recognitional picketing within twelve months of a valid election. The Board cross-petitions for enforcement of its order that the Union cease and desist from such activity. The principal issue between the parties is whether the Board properly interpreted the statute to bar picketing by a formerly incumbent union that has been defeated in a Board election. We uphold the Board's interpretation, and accordingly deny the Union's petition for review and grant the Board's cross-petition for enforcement.
 
 I. BACKGROUND
 
 2
 When the collective bargaining agreement between the Union and the Pepsi-Cola Newburgh Bottling Company expired in 1989 without the parties having reached an agreement on a new contract, the Union called a strike and all of the 85 or so employees in the bargaining unit walked out. The Employer hired replacement workers, resumed operations, withdrew its recognition of the Union, and when the Union persisted in picketing its premises, petitioned the NLRB for a representation election.
 
 
 3
 The Union, disclaiming any desire to represent the entire bargaining unit (which now consisted of both the strikers and the replacements), and asserting its interest in representing only the striking workers, refused to participate in the election and sought to have its name removed from the ballot. The Regional Director of the NLRB rejected the Union's disclaimer argument and denied its request to be removed from the ballot. The result of the election, which the Union boycotted, was 113-1 against its continuing to represent the bargaining unit employees. The Union raised no objection to the election, and the Regional Director accordingly decertified it as the representative.
 
 
 4
 Undaunted, the Union continued to picket the Employer, using the same signs and leaflets as it had before the election. As the parties stipulated, the Union's position was (and is) that "it is on strike to secure the return of the positions of the strikers with the employer and to negotiate terms and conditions under which they will work upon their return to employment." The Employer then charged that the Union's post-election picketing violated Sec. 8(b)(7)(B) of the Act, and the Board's General Counsel issued an unfair labor practice complaint. The Union responded that Sec. 8(b)(7)(B) does not apply to picketing initiated by an incumbent union engaged in a lawful economic strike, pointing to the Board's similarly limited interpretation of Sec. 8(b)(7)(C), which also regulates recognitional picketing.* In addition, the Union challenged the validity of the election, on the ground that the Employer had padded the rolls by hiring an excessive number of replacements in order to obtain a majority vote against the Union.
 
 
 5
 The ALJ held (1) that the Union is not exempt from Sec. 8(b)(7)(B), notwithstanding its status as an incumbent when it started picketing, and (2) that it is precluded from challenging the validity of the election in the unfair labor practice proceeding because "voter eligibility issues ... could have been litigated in the underlying representation proceeding." Accordingly, the ALJ revoked the Union's subpoenas of the Employer's personnel records. The ALJ subsequently held that the Union violated Sec. 8(b)(7)(B) of the Act, and the Board affirmed, ordering the Union to cease and desist from picketing and to take certain affirmative steps.
 
 II. RECOGNITIONAL PICKETING
 
 6
 The Union argues principally that the recognitional picketing prohibited by Sec. 8(b)(7)(B) does not include picketing begun by a recognized union in support of a peaceful economic strike. In what seems to be almost an afterthought, the Union adds that a contrary interpretation would violate the First Amendment to the Constitution of the United States.
 
 
 7
 The statutory aspect of this argument is based upon case law describing "blackmail picketing," i.e., recognitional picketing by a minority union, as "the evil with which Congress was predominantly concerned" in Sec. 8(b)(7)(C), Dayton Typographical Union No. 57 v. NLRB, 326 F.2d 634, 636 (D.C.Cir.1963), and upon the Board's interpretation of Sec. 8(b)(7)(C) not to proscribe picketing by an incumbent union. Warehouse Employees Union No. 570 (Whitaker Paper), 149 NLRB 731, 735 (1964). The Union argues that "[s]ince the policies and purposes underlying Sec. 8(b)(7) are equally applicable to Sec. 8(b)(7)(C) ... as they are to Sec. 8(b)(7)(B)," the two sections require a parallel interpretation. And the picketing in this case, the Union argues, was merely the continuation of a lawful economic strike begun by an already recognized union, and not an attempt by a minority union to "blackmail" its way to recognition.
 
 
 8
 The Union's statutory argument enters the lists against long odds. At the outset, the Union concedes that "a literal reading of the language of Sec. 8(b)(7) would appear to bar the picketing conducted in this case," and that there is no specific legislative history or other evidence of congressional intent to create an exception to the plain meaning of that language. In addition, the NLRB provides a perfectly reasonable basis in policy--the congressional desire to guarantee a period of repose following a valid election--for its uniform application of Sec. 8(b)(7)(B) against recognitional picketing, whether that of a former incumbent or that of a newcomer.
 
 
 9
 Against these considerations, the Union offers the Board's own supposedly inconsistent interpretation of Sec. 8(b)(7)(C). In Whitaker Paper, the union struck and began to picket after negotiations over a new collective bargaining agreement had reached impasse. The company hired replacements and claimed a good faith doubt as to the union's majority status, but neither the company nor the union petitioned for an election. The union continued its picketing, and the employer filed a Sec. 8(b)(7)(C) charge. The Board found no violation, relying heavily upon Building and Construction Trades Council of Santa Barbara County (Sullivan Electric Co.), 146 NLRB 1086 (1964), in which it had determined that the phrase "recognize or bargain" in Sec. 8(b)(7) was "intended to proscribe picketing having as its target forcing or requiring an employer's initial acceptance of the union as the bargaining representative of his employees." 146 NLRB at 1087 (emphasis added). There is room for doubt whether Whitaker Paper is consistent with current Board policy under Sec. 8(b)(7)(C). See Hasset Storage Warehouse, Inc., 287 NLRB 735, 739 (1987) ("the prohibitions of Section 8(b)(7)(C) are not limited to 'initial' recognitional activities, by [sic] that they also extend to recognitional activities by a union to re-establish lawfully withdrawn recognition"); cf. Penello v. Warehouse Employees Union Local 570, 230 F.Supp. 900, 904 (D.Md.1964) (Sec. 10(l) injunction proceeding arising out of same dispute as Whitaker Paper: "This Court finds no justification in the statute, the legislative history or the cases interpreting the statute, for limiting sec. 8(b)(7) to picketing having as its target forcing or requiring an employer's initial acceptance of the union"). The Board has never repudiated Whitaker Paper, however, and distinguished it in deciding this case.
 
 
 10
 The Board's present interpretations of Secs. 8(b)(7)(B) and (C) are based upon the difference between picketing when there is no Board election in the picture and picketing that occurs immediately after the Board has held an election. Under the Board's approach, an employer's good faith but untested doubts concerning an incumbent union's majority status are not sufficient to put that union on the same footing as a stranger seeking "initial acceptance," whereas a valid election in which a majority of the employees reject the union has precisely that effect. This latter conclusion is fully consistent with the general purposes of Sec. 8(b)(7):
 
 
 11
 first, to encourage prompt resort to the election machinery, rather than protracted picketing, as the method for resolving representation questions; [and] secondly, to eliminate recognitional picketing where resort to the election machinery is barred either by a recent election or by a collective bargaining agreement with another union.
 
 
 12
 Meltzer, Organizational Picketing and the NLRB, 30 U.Chi.L.Rev. 78, 83 (1962). See Dayton Typographical, 326 F.2d at 646 ("purpose of Congress in passing Section 8(b)(7) [was] the encouragement of elections under the aegis of the Board"). That the Board (in Whitaker Paper) thought that the picketing of a union about which the employer had merely a good faith doubt as to its majority status was not intended to force the employer to "recognize or bargain" within the meaning of Sec. 8(b)(7)(C) does not imply that such purpose is absent, for purposes of Sec. 8(b)(7)(B), when the picketing occurs after the union has undeniably lost any claim to the status of majority representative.
 
 
 13
 We note that the Tenth Circuit has considered and rejected another union's identical attempt to import the Board's interpretation of Sec. 8(b)(7)(C) into its reading of Sec. 8(b)(7)(B). NLRB v. Lawrence Typographical Union No. 570, 376 F.2d 643 (1967). As that court pointed out, a previously recognized union, having lost a valid election, "occupies no better position than the union which has, through a Board election, sought and failed to have itself accepted initially as the bargaining representative." Id. at 653 (emphasis in original). The election wipes the slate clean; the losing union's status as an "incumbent" is terminated and can afford it no protection from the clear command of Sec. 8(b)(7)(B). To hold otherwise
 
 
 14
 would invite a losing incumbent union to resort to such picketing as a pressure tactic to wrest the representative status and recognition which it was denied by the employees' freely expressed choice at the ballot box, would unstabilize [sic] the situation for a period of 12 months during which no new election could be held in accordance with Section 9(c)(3), and would subvert and nullify the very purpose for which Section 8(b)(7)(B) was enacted.
 
 
 15
 Id. (quoting the trial examiner in the underlying decision). We agree.
 
 
 16
 The Union next invokes a principle of statutory construction crafted in order to minimize conflicts between the Congress and the First Amendment to the Constitution: the court should not impute to the Congress an intent to restrict peaceful picketing unless the legislature has targeted an "isolated evil" that it wishes to curb, and in so doing has clearly expressed the scope of the restriction. NLRB v. Fruit & Vegetable Packers and Warehousemen (Tree Fruits), 377 U.S. 58, 62-63, 71, 84 S.Ct. 1063, 1065-66, 1070, 12 L.Ed.2d 129 (1964). The Board's interpretation of Sec. 8(b)(7)(B) is consistent with this principle. The statute is clear in creating a twelve-month period of repose following a valid election, during which time recognitional picketing is generally barred. This is a precise and direct response to the "evil" of a union that seeks to harass its way to recognition after the employees have rejected it as their representative and while Sec. 9(c)(3) of the Act remains a bar to holding a second election. See Lawrence Typographical Union No. 570, 158 NLRB 134 (1966).
 
 
 17
 The Union appeals also to a higher authority: "It is hornbook law," we are told, "that if Sec. 8(b)(7)(B) is so construed, then the section has to be deemed to abridge freedom of speech in violation of the First Amendment." The Union fails to cite even a hornbook, however, and the law to be found in the law reports leads us to conclude that Sec. 8(b)(7)(B), as construed, is within constitutional bounds. Cf. Building Service Employees Int'l Union, Local 262 v. Gazzam, 339 U.S. 532, 540, 70 S.Ct. 784, 788, 94 L.Ed. 1045 (1950) (state injunction barring post-election picketing seeking recognition of a defeated union does not violate First Amendment); Miller v. United Food and Commercial Workers Union, Local 498, 708 F.2d 467, 471 (9th Cir.1983) ("Courts of Appeals have uniformly upheld [against first amendment challenge] the section 8(b)(7)[C] restriction against picketing for recognitional purposes as a legitimate exercise of that authority to promote labor democracy and the orderly settlement of representational controversies") (citing, inter alia, Dayton Typographical, 326 F.2d at 649). Thus, again in accord with the Tenth Circuit, we reject the Union's arguments for disallowing the Board's interpretation of Sec. 8(b)(7)(B). Lawrence Typographical, 376 F.2d at 654.
 
 
 18
 Finally, the Union argues that because it has consistently disavowed recognition as an objective, its picketing was not recognitional but only "in furtherance of an economic strike." When the picketing began, the Union was the recognized bargaining representative of the employees; the picketing was indeed in furtherance of an economic strike. Once the Union lost its status as the bargaining representative, however, the Union's continued picketing for the admitted purpose of bargaining on behalf of the striking employees was necessarily also recognitional because the Union's right to bargain is dependent upon the Employer's obligation to recognize it as the bargaining representative of the employees. The objection is therefore frivolous.
 
 III. PRECLUSION OF ELECTION CHALLENGE
 
 19
 The Union next argues that it is entitled to subpoena evidence relevant to the validity of the election for use in defending itself in this unfair labor practice proceeding. NLRB Rule 102.67(f), 29 C.F.R. Sec. 102.67(f), generally precludes a party's litigating in an unfair labor practice proceeding any issue that it could have raised in the representation proceeding, see NLRB v. Mar Salle, Inc., 425 F.2d 566, 572 (D.C.Cir.1970). The Union, however, claims the benefit of the exception, established in Board precedent, where there is new or previously unavailable evidence to support the challenge to the election. See Teamsters Local 911 (General Felt), 275 NLRB 980, 981 (1985). In this, the Union overlooks an important qualification on the availability of that exception: "the Respondent must have made some effort to obtain the evidence at the time of the [representation] hearing." Id.
 
 
 20
 The Union's failure to inquire into the Employer's alleged payroll (and therefore election roll) padding prior to the representation proceeding bars it from raising the issue now. Prior to the election, the Union had been given an Excelsior list showing the names and addresses of all the replacement workers. Both the number of replacement workers and their possible effect upon the election were thus apparent to the Union as of the time of the representation proceeding. Having failed then to raise its objection to the election, or to "ma[k]e some effort to obtain the evidence" necessary to make good such an objection, the Union cannot be heard now to complain of its preclusion.
 
 IV. CONCLUSION
 
 21
 In sum, we find that the agency interpreted the statute in a manner that is reasonable and consistent with both its plain language and the First Amendment, and properly applied its own procedural rule. The petition for review is therefore denied, and the cross-petition for enforcement is granted.
 
 
 22
 So ordered.
 
 
 
 *
 Sections 8(b)(7)(B) and (C) provide that it shall be an unfair labor practice
 to picket or cause to be picketed ... any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees ... unless such labor organization is currently certified as the representative of such employees:
 (B) where within the preceding twelve months a valid election under section 9(c) has been conducted, or
 (C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing....